## National Concrete Construction Co. v. Duvall, et al.

(Decided October 24, 1912.)

Appeal from Jefferson Circuit Court.
(Common Pleas, First Division).

1. Master and Servant—Third Person—Injury to—Negligence—Sufficiency of Evidence.—In an action by a third person against a master to recover damages for personal injuries alleged to have resulted from the negligence of the master's servants, evidence

examined and held sufficient to sustain a verdict in favor of the plaintiff.

2. Verdict—Damages—Excessive.—In an action for damages for personal injuries, evidence examined and a verdict of $5,000 held not excessive.

3. Master and Servant—Third Person—Injury—Negligence of Servants—Liability of Master—Degree of Care.—Where a contractor's servants and his employer's servants are engaged in the common work of constructing and placing an air compressor, the employer's servants attending to the making of the excavation and the construction of a templet to be placed thereon for the purpose of fixing in the proper position the bolts and nuts to be fitted in the compressor, and the contractor's servants attending to the construction of a concrete base into which the bolts and nuts are to be fitted below, it is the duty of the contractor's servants to use ordinary care to avoid injuring one of his employer's servants, if they know, or by the exercise of ordinary care could know, that he was in the excavation; and for a failure in this respect the contractor is liable.

4. Evidence—Hearsay.—A message passing from one person to another, without evidence that the sender sent the message, and that the message so sent was actually delivered to the person claiming to have received it, is mere hearsay, and is not rendered admissible by evidence to the effect that the person receiving the message usually received messages in that way.

SHIELD & CAMPBELL, CAMDEN R. McATEE for appellant.

EDWARDS, OGDEN & PEAK and ALFRED SELLIGMAN for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

Plaintiff, W. T. Duvall, brought this suit against the defendants, the Standard Sanitary Manufacturing Company and the National Concrete Construction Company, to recover damages for personal injuries. The court directed a verdict in favor of the Standard Sanitary Manufacturing Company, and the jury awarded damages against the National Concrete Construction Company in the sum of $5,000. From that judgment the National Concrete Construction Company appeals.

The Standard Sanitary Manufacturing Company (hereinafter called the Sanitary Company) was engaged in installing an air compressor at its plant in Louisville. The air compressor was to be placed on a concrete base. The concrete base was to be set in the ground, and to

this end the Sanitary Company made an excavation about 16 feet in width, 26 feet in length and 7 or 8 feet in depth. For the purpose of anchoring the air compressor securely to the concrete base, a number of large steel or iron bolts were to be placed in the concrete and fitted in the corresponding holes in the air compressor. After making the excavations, the Sanitary Company constructed a wooden frame, called a templet, which was to be placed over the top of the excavation, and from which the bolts were to be swung and set in the concrete, so as to be in proper position to fit the holes in the air compressor. The templet was made by the Sanitary Company and placed over the excavation. It rested on iron I-beams. The I-beams weighed about 400 pounds each. They not being quite long enough to extend over the excavation, it was found necessary to place some heavy planks over the excavation, upon which the I-beams were rested. After constructing the templet, it was found that it was too large to get it out the door. It was then sawed in two, and when placed over the excavation, there were cleats nailed across it to hold the boards together. The iron bolts were placed in proper position, and brick placed under them in the bottom of the excavation in order that they might not be shaken out of position when the concrete was being poured in.

The Sanitary Company employed the National Concrete Construction Company (hereinafter called the Concrete Company) to make the concrete base. The concrete was to be mixed on the outside and then poured into the excavation. After mixing the concrete, it was to be carried in buggies to the excavation and dumped in. These buggies, when loaded, weighed about 500 pounds.

The templet was completed on the night of May 31, 1910. On the morning of June 1, plaintiff, W. T. Duvall, a carpenter employed by the Sanitary Company, was directed by his foreman to go to the excavation and finish placing the iron bolts through the templet. His helper was a man by the name of Welch. When they arrived at the excavation, it was found that the wrench which they had was not large enough to fit on the nuts that were to be screwed on the iron bolts. Plaintiff was in the excavation when Welch discovered that his wrench was too small. Welch then returned to the shop to get another wrench. While he was gone, plaintiff was in

the bottom of the excavation spliting some blocks, and was in a stooping position. While plaintiff was in the pit, the Concrete Company proceeded to lay its runways. The runways were heavy oak planks, 3 inches thick, 20 inches wide and 26 feet long. The runways according to some of the witnesses upon the I-beams; according to others on the templet. The concrete mixer was some distance from the corner of the excavation, and to reach it, the runways rested upon horses or forms, which were placed on the ground. As soon as the runway was placed, one of the Concrete Company's servants ran a buggy of concrete out on the templet for the purpose of dumping it into the excavation. This caused one of the I-beams to fall and strike plaintiff in the side, causing certain injuries which will hereafter be noticed.

Two witnesses testified to the fact that Kimball, the Concrete Company's foreman, knew of the presence of Duvall in the excavation. Plaintiff's evidence also tends to show that neither the templet nor the iron beams upon which it rested were intended as a support for the runways, and that if so used it was necessary to furnish them additional support; that while the Concrete Company did furnish additional support in one place, the I-beams should have been supported in two places, in order to furnish a proper platform for the buggies loaded with concrete. There is also evidence tending to show that the mere motion of the buggies, unless the templet and iron beams were further supported, would have a tendency to shake them out of their position and thus render them liable to fall. It was the contention of the Concrete Company that its foreman did not know of the presence of Duvall in the excavation, although he did know that two of the Concrete Company's helpers were there. There was an attempt also to show that the Concrete Company did not proceed with its work until it had been notified by the agents of the Sanitary Company that everything was in readiness.

We deem it unnecessary to give a more complete statement of the facts. It is sufficient to say that in spite of the Concrete Company's claim that it did everything within its power to make its runway safe, there was evidence tending to show negligence on its part, and it cannot be said that the jury's finding upon the facts is flagrantly against the evidence.

One of the Concrete Company's principal contentions is that the verdict is excessive. According to plaintiff's evidence, one of the iron beams, weighing several hundred pounds, struck him in the side and groin. He could not straighten up, and was not able to get out of the hole. He was afterward carried to the hospital, where he remained about eleven days. He then went to his home, and remained in his bed four or five weeks. After that he was up and down. After being up a while he would have to go back to bed. He suffered with intense pain in his testicle. After stooping or walking, his testicle would swell up. Several months later, he went to work and was earning $10 a week wrapping up shoes. He was unable to do any heavy work. On one occasion, while working in the Stewart Dry Goods Company's store, he attempted to polish some counters. This work was too heavy for him, and he had to take a rest on account of it. Prior to the accident, he weighed about 167 pounds; when he testified he weighed about 148 pounds. On account of the accident, he had lost all sexual desire, and all power of procreation. At times his spermatic cord pained him very much. Ever since he was hurt, he had been in a nervous condition, and the least thing got him all to pieces. Prior to his injury he was as strong as anybody. Dr. Oscar Bloch, plaintiff's family physician, first saw him at the hospital. When the doctor saw plaintiff, plaintiff was apparently suffering a great deal. Plaintiff had great tenderness over the vermiform appendix. At one time, witness thought that the case would terminate in appendicitis, but that passed away. While he saw no external marks of injury, plaintiff was quite swollen, and apparently tender. In speaking of plaintiff's condition at the time he testified, Dr. Bloch said: "He looks decidedly thinner, and his voice, as I heard him testify here, is that of a sick man." He also said: "He has a limp, and I have taken occasion to watch him when he did not know I was watching him, to see if he continued to limp, and he has limped all the time I have seen him." Upon being asked whether or not plaintiff's injuries were permanent, he said he was unable to form any opinion. Dr. Roberts testified that he examined plaintiff shortly before the trial. Plaintiff limped a great deal in his right leg, and complained of soreness from about the middle of the abdomen on the right side, down into the testicle. He

was very tender. His spermatic cord was very tender to the touch. The first time he touched plaintiff plaintiff nearly jumped off the table. When plaintiff wanted to pass water, he would have to strain a good deal, and wait for the water to come. In his opinion, there was a very perceptible difference between plaintiff's two sides, his right side being the larger. Plaintiff's right testicle appeared to be shrunken. In his opinion, plaintiff's capacity had been impaired and affected by reason of his condition. Did not think that plaintiff could do any manual labor at that time; could not say whether plaintiff's condition was permanent or not. It might be relieved by an operation for varicocele, an operation that is necessarily attended with some danger. Several of plaintiff's neighbors and friends testified to the fact that he was in a much worse condition after the accident than before; that he walked about with a cane, had lost weight, and was in a pulled-down condition.

The Concrete Company claims that there is absolutely no proof that plaintiff's injuries are permanent, and that $5,000 is entirley too large a verdict for mere pain and suffering. It is true that neither one of plaintiff's physicians would give an opinion as to the permanency of his injury, but neither one indicated any probability that his condition would be relieved. On the contrary, Dr. Roberts rather intimates that his condition might be relieved by an operation for varicocele, but that this operation was attended with danger, and he was not sure that it would afford relief. We have undeniable testimony, however, that he had suffered the loss of about 20 pounds in weight; that his testicle had shrunken; that he walked with a limp; that whenever he attempted to do any heavy work, he was unable to do so; that he suffered a great deal of pain in his testicles and spermatic cord, whenever he attempted to to any work. This trial took place about a year after the injury. Such was his condition at the time of the trial. In view of the impairment of his power to do heavy work of any kind, of his continued suffering in his testicle and spermatic cord, together with the uncontradicted evidence that his power of procreation is impaired, if not entirely destroyed, we cannot say that the verdict of $5,000 is excessive.

Another error relied upon is the failure of the court to permit the Concrete Company to file an amended answer and cross-petition, but the propriety of the court's

action in this respect cannot be considered, inasmuch as the amended answer and cross-petition were not made a part of the record, either by bill of exceptions or order of court. The fact that it was tendered does not alter the rule. Hortsman v. Lexington & Covington R. R. Co., 18 B. Mon., 218; Young, McDowell Co. v. Bennett, 7 Bush, 474.

It is next insisted that the court erred in excluding certain evidence. It appears that Mr. Kimball, the Concrete Company's foreman, testified that Mr. Probst, the Sanitary Company's superintendent, instructed him not to do anything until he got ready, and that on the morning of the accident, word was sent to Kimball that they were ready. It developed, however, that this word passed from man to man until it reached Kimball at the mill room. Kimball attempted to testify that he was in the habit of receiving messages in that way. The statement was objected to, and the evidence excluded. There was no attempt to show that Probst, or anyone in authority, had given the message that they were ready to any particular man, and that this exact message was transmitted to Kimball. Manifestly, such a message, if transmitted from man to man, without showing who heard it or who told it, is mere hearsay, and should not be admitted. If such were the rule, mere rumor would take the place of direct testimony.

The instructions in this case imposed upon the Concrete Company, its servants and agents, the duty to use ordinary care to avoid injuring plaintiff if they knew, or by the exercise of ordinary care should have known that he was in the excavation. It is insisted that as the relation of master and servant did not exist between the Concrete Company and plaintiff, the instructions imposed upon the Concrete Company and its servants too high a degree of care, it being argued that the law imposed upon the Concrete Company's servant only the duty to use ordinary care to avoid injuring plaintiff if they actually knew that he was in the excavation. In this connection we are referred to the language of this court in Ottis Elevator Co. v. Wilson, 147 Ky., 676, where the court said:

"Appellant concedes that it owed Wilson the duty to exercise ordinary care to avoid injuring him after discovering his peril, even though the relationship of master

and servant did not exist between them. We think this well established rule of law is applicable to this case.''

In that case, however, the servant of the Elevator Company knew that the plaintiff, Wilson, was engaged in making the wire casings and fencings around the elevator shaft. Indeed, he claims that he notified the plaintiff as he passed that he would be going back in a few minutes. In discussing that case, therefore, the court treated it from the standpoint of knowledge on the part of the Elevator Company of plaintiff's peril, and of its consequent duty to exercise ordinary care to avoid injuring him. It was unnecessary, therefore, to determine whether or not the Elevator Company owed any greater duty in that case. In this case it is true that plaintiff was not the servant of the Concrete Company; still, he was not a trespasser or even a mere licensee. He was an employe of the Sanitary Company, and was rightfully in the excavation. The work of installing the air compressor was a joint work. Plaintiff and other servants of the Sanitary Company were engaged in constructing the templet, setting it in place and adjusting the bolts and nuts preparatory to the laying of the concrete base by the servants of the Concrete Company. In other words, the servants of each particular company were doing a particular part of the common work. They were, therefore, brought into immediate association and direct contact with each other. In constructing the concrete base, the servants of the Concrete Company were acting within the actual scope of their employment, and in furtherance of their master's business. It will not do, therefore, to say that the Concrete Company's servants owed the plaintiff no other duty than to exercise ordinary care to avoid injuring him after they knew of his presence in the pit. Knowing that the plaintiff was engaged on common work, we think they had reason to anticipate his presence in the pit, and having reason to anticipate his presence, it was their duty to exercise ordinary care to find out whether he was present or not in the excavation, before subjecting him to danger. We therefore conclude that if the Concrete Company's servants knew, or by the exercise of ordinary care could have known, that plaintiff was in the pit, and failed to use ordinary care to avoid injuring him, the Concrete Company was liable for their negligence.

Being charged as joint tort feasors, the Concrete Company has no cause for complaint that the court directed a verdict in favor of the Sanitary Company. There being no cross-appeal by the plaintiff, the propriety of the court's action in this respect is not before us. City of Louisville v. Hart's Admr., 143 Ky., 177.

Judgment affirmed.