Marilyn JENKINS, as Parent and Next Friend of Justin Branum, a Minor, Appellant,

v.

Gail BEST, M.D.; and University Obstetrical and Gynecological Associates, P.S.C., Appellees.

and

John M. Farmer, M.D.; Baptist Healthcare System, Inc., d/b/a Baptist Hospital East; and Marilyn Jenkins, as Parent and Next Friend of Justin Branum, a Minor, Appellants,

v.

Gail Best, M.D.; and University Obstetrical and Gynecological Associates, P.S.C., Appellees.

and

Baptist Healthcare System, Inc. d/b/a Baptist Hospital East, Appellant,

v.

Gail Best, M.D.; and University Obstetrical and Gynecological Associates, P.S.C., Appellees.

Nos. 2006–CA–001277–MR, 2006–CA–001286–MR, 2006–CA–001295–MR.

Court of Appeals of Kentucky.

Sept. 28, 2007.

David B. Gray, Kevin P. Weis, Goldberg & Simpson, P.S.C., Louisville, KY, for appellant Marilyn Jenkins, as Mother and Next Friend of Justin Branum.

Daniel G. Brown, Darby & Gazak, P.S.C., Louisville, KY, for appellee, University Obstertrical and Gynecological Associates, PSC.

Bradley R. Hume, Beth H. McMasters, Thompson, Miller & Simpson, P.L.C., Louisville, KY, for appellee, Gail Best, M.D.

Gerald R. Toner, Gregory S. McDonald, Katherine Kerns Vesely, O'Bryan, Brown & Toner, Louisville, KY, for appellant, John Farmer, M.D.

Susan Phillips, William P. Swain, Tera M. Rehmel, Phillips, Parker, Orberson, & Moore, P.L.C., Louisville, KY, for appellant, Baptist Hospital East.

Before ACREE and TAYLOR, JUDGES; KNOPF,[1] Senior Judge.

## OPINION AND ORDER

ACREE, Judge.

Marilyn Jenkins ("Jenkins"), John M. Farmer, M.D. ("Dr. Farmer") and Baptist Healthcare System, Inc. d/b/a Baptist Hospital East ("Baptist Hospital") bring three separate appeals challenging summary judgments in favor of Gail Best, M.D. ("Dr. Best") and University Obstetrical and Gynecological Associates, P.S.C. ("University Associates") entered in Jenkins' medical malpractice action. Having thoroughly examined the record, we conclude that Dr. Farmer and Baptist Hospital have no standing to challenge the summary judgments in favor of their former co-defendants, and their appeals shall be dismissed. With regard to the remaining appeal filed by Jenkins, we affirm the summary judgment in favor of Dr. Best and reverse and remand the summary judgment in favor of University Associates.

## FACTS

Lacking the services of a perinatology[2] specialist on its own staff, Baptist Hospital

---

1. Senior Judge William L. Knopf sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

2. Perinatology is a subspecialty of obstetrics concerned with care of the mother and fetus

contracted with University Associates to provide them. Pursuant to the contract, University Associates was to employ its own "perinatologists to provide perinatology services for [Baptist Hospital] and patients ... on call ... on a 24 hours-a-day and seven days-a-week basis."

Additionally, the contract required University Associates "to provide a Medical Director to provide administrative services" who would serve on hospital committees, report to the medical staff, develop Baptist Hospital's perinatology services policy, and provide continuing medical education lectures. Furthermore, the Medical Director was also required to "[p]articipate in activities related to advertising the perinatology services [offered by Baptist Hospital, a]ssist in Certificate of Need applications, hearings and proceedings [and h]elp prepare for JCAHO [Joint Commission on Accreditation of Healthcare Organizations] and state licensing visits annually." The purpose of the contract therefore was not simply to provide services to patients, but to enhance the credentials and reputation of Baptist Hospital.

The particular contract before us, signed on October 11, 2001, was an extension or renewal of a previous agreement under which University Associates had been providing these services to Baptist Hospital since at least 1998. The contract was mutually nonexclusive, permitting both parties to enter into similar contracts with others. University Associates did enter into at least one other contract, with the University of Louisville Hospital, to provide these same services.

Dr. Best is a medical doctor with advanced training in obstetrics and gynecology, specifically, in perinatology. University Associates engaged Dr. Best as an employee to assist in performing the perinatology services required of University Associates in fulfilling its service contracts both with University of Louisville Hospital and with Baptist Hospital.

On March 28, 2003, University Associates scheduled Dr. Best to be on call to deliver babies at the University of Louisville Hospital from 5:00 p.m. until 8:00 a.m. the next morning. This contract required Dr. Best to remain in-house at that hospital during the thirteen-hour shift. University Associates also scheduled Dr. Best to be on call during this same time period to perform perinatal care at Baptist Hospital. University Associates had no contingency plan in the event the actual demands of both contracts required simultaneous performance.

In the late afternoon of March 28, 2003, the family of Marilyn Jenkins took her to Baptist Hospital for her second visit that day. She was thirty weeks pregnant and complained of abdominal pain and vaginal bleeding during both visits. Baptist Hospital nurses provided Jenkins' initial care that evening, though they consulted with Dr. Farmer by telephone. Dr. Farmer is a general obstetrician who saw Marilyn Jenkins pursuant to his crossover cover arrangement with Dr. Robert Schweitzer, her regular obstetrician.

At first, the nurses did not believe the unborn child was in any particular distress. Jenkins' potassium levels were variable and appeared low but they were showing reassuring signs of rising. This was reported to Dr. Farmer by telephone. He ordered that Jenkins be given oral potassium after which she could go home. But her family members, concerned about her bleeding, wanted her to be seen by a

during pregnancy, labor, and delivery, particularly when the mother or fetus is at high risk for complications. STEDMAN'S MEDICAL DICTIONARY 1459 (28th ed.2006).

physician. Responsive to this request and "to more or less reassure the family," Dr. Farmer ordered an ultrasound to be performed by a perinatologist. The nurse told Jenkins, and presumably her family, of the plan for an ultrasound.

The duty nurse called Dr. Best at 9:02 p.m. to request that she come and perform the ultrasound. Dr. Best's testimony and the nurse's notes show that "Dr. Best said she can't come tonight but may be able to do [the ultrasound] in the a.m." The nurse telephoned Dr. Farmer, telling him that Dr. Best was unable to see Jenkins until the morning. Dr. Farmer decided to go to the hospital to examine Jenkins himself.

Dr. Farmer arrived at the hospital at 9:27 p.m. and undertook an examination of Jenkins. He noted "only very scant" blood, but no active bleeding, and the cervix appeared closed. He then ordered a twenty-three hour admission for Jenkins, ordered bed rest for the patient, and for vital signs to be taken every four hours. He decided that the ultrasound should be conducted in the morning to rule out placenta previa.[3] A nurse, following this order, contacted Dr. Best at 10:04 p.m. to schedule the ultrasound for the next morning.

When the shift changed at 11:00 p.m., a new nurse assigned to Jenkins examined her and became concerned. Shortly before midnight, the nurse called Dr. Farmer expressing that concern and informing him of Jenkins' condition. She gave Dr. Farmer the vital signs for Jenkins and for her unborn baby. Dr. Farmer ordered that Jenkins be immediately transferred to a third hospital, Norton Suburban Hospital, where a complete obstetrical ultrasound could be performed that night. Early the next morning, Jenkins delivered her son by Caesarian section. Justin Branum was born with hypoxic ischemic encephalopathy[4] which rendered him permanently and totally disabled. Sadly, Jenkins' counsel informed the Court during oral argument that Justin subsequently passed away.

When deposed, Dr. Farmer stated that he was unaware that University Associates had no contingency plan in the event Dr. Best was unable to come to Baptist Hospital. He knew, however, that he had initially requested that the ultrasound be conducted that evening and not the next morning. He insists that he ordered a complete Level 2 obstetrical ultrasound by a qualified perinatologist, not merely a routine Level 1 ultrasound. He assumed that the nurses had apprised Dr. Best of Jenkins' condition. Based on this assumption, knowledge and lack thereof, Dr. Farmer assumed that Dr. Best's decision to conduct the ultrasound in the morning was indicative of her opinion that Jenkins' medical condition was not urgent. Dr. Farmer testified that his belief was bolstered by his assumption that if Dr. Best had not been comfortable putting off the ultrasound until the morning, she would have arranged for another specialist to conduct the ultrasound that night. This she did not do.

## PROCEDURAL HISTORY

On October 10, 2003, Jenkins filed a medical malpractice action in Jefferson Circuit Court against Baptist Hospital, Dr. Farmer, University Associates, Dr. Best,

---

3. Placenta previa is a condition in which the placenta is implanted in the lower segment of the uterus thereby partially or completely obstructing the internal bone of the cervix. STEDMAN'S MEDICAL DICTIONARY 1502 (28th ed.2006).

4. Hypoxic ischemic encephalopathy is a term for irreversible brain damage caused by a lack of oxygen and blood flow to the brain, often occurring during birth. STEDMAN'S MEDICAL DICTIONARY 588 (27th ed.2000).

and Norton Healthcare, Inc. d/b/a Norton Suburban Hospital. No cross-claims were filed. After nearly two years of discovery, University Associates and Dr. Best filed motions for summary judgment to which Baptist Hospital and Dr. Farmer responded. Jenkins filed no written response, but verbally adopted the written responses of Baptist Hospital and Dr. Best by reference during the January 2006 hearing.

At the hearing, Dr. Best argued that she never had a physician-patient relationship with Jenkins. Therefore, Dr. Best owed no duty to Jenkins and was entitled to judgment as a matter of law. University Associates argued that, because Dr. Best owed no duty to Jenkins, it could not be vicariously liable to her.

In opposing these motions, Baptist Hospital and Dr. Farmer did not dispute the absence of the traditional physician-patient relationship. Instead, they presented two arguments to get around its absence. First, they argued that Kentucky has adopted a "universal duty of care" wherein every person owes a duty to every other person to exercise ordinary care to prevent foreseeable injury. Second, they argued that Jenkins was a third-party beneficiary of the contract between Baptist Hospital and University Associates.

The Jefferson Circuit Court rejected both arguments of Baptist Hospital and Dr. Farmer. On March 23, 2006, summary judgment was entered in favor of Dr. Best and University Associates. Because it was an interlocutory order, on May 26, 2006, the trial court entered an order pursuant to Kentucky Rule of Civil Procedure (CR) 54.02 declaring that there was no just reason for delay and that the summary judgments were final.

Jenkins filed her Notice of Appeal on June 21, 2006. Dr. Farmer filed his Notice of Appeal on June 22, 2006, and Baptist Hospital filed a Notice of Appeal on June 23, 2006.

Dr. Best and University Associates filed motions with this Court to dismiss the appeals of Dr. Farmer and Baptist Hospital arguing they have no standing to bring them. We address those motions first.

· *MOTIONS TO DISMISS APPEALS*

■ We believe the Appellees' motions are well taken and, for the following reasons, we dismiss both Dr. Farmer's and Baptist Hospital's appeals.

Appellees' argument for dismissal is best summarized in one of three cases cited by Dr. Best.

> It is a universal rule that a joint tort-feasor ... will not be heard to complain on appeal ... that the suit was dismissed as to a co-defendant.

*Martin v. Ackman,* 270 Ky. 640, 110 S.W.2d 437, 438 (Ky.1937)(numerous citations omitted); *see also National Concrete Const. Co. v. Duvall,* 150 Ky. 192, 150 S.W. 46, 49 (Ky.1912)("Being charged as [one of multiple] joint tort-feasors, the [appellant] has no cause for complaint that the court directed a verdict in favor of the [co-defendant below]."). This straight forward rule, claims the appellees, justifies dismissal of these appeals.

Dr. Farmer and Baptist Hospital apparently agree that this rule would compel dismissal of their appeals, but only if we applied case law predating our Supreme Court's adoption of comparative negligence in *Hilen v. Hays,* 673 S.W.2d 713, 719 (Ky.1984). They argue that *Hilen* rendered the rule described in *Martin* obsolete. This is the first time since *Hilen* that we have been asked to address the rule's continued viability.

■ Our analysis begins by asking generally: Who is entitled to appeal a judgment? Appellants correctly answer that

all parties who are aggrieved by a trial court's order are entitled to appeal it. *Civil Service Commission v. Tankersley*, 330 S.W.2d 392, 393 (Ky.1959)("In order for a party to maintain an appeal from a judgment it is essential that he shall be aggrieved or prejudiced by the judgment[.]"). They cite *Brashear v. Brashear*, 284 Ky. 623, 145 S.W.2d 542 (1940) for the proposition that "to present a reviewable question by this court it should appear that [appellants were] wrongfully deprived of some right by the judgment appealed from[.]" *Brashear* at 542. These elemental concepts also predate *Hilen v. Hays*. We have no doubt they survived that case intact.

We also know from the "universal rule" itself that, prior to *Hilen*, a defendant in a tort action who remained liable to the plaintiff had no right to appeal the dismissal of a co-defendant. *Martin* at 438. This is tantamount to holding that the defendant had no right to appeal his co-defendant's dismissal just to keep him in the damages pool.

This brings us to the next and most important question: Did *Hilen* create the right of a defendant in a tort action to appeal the dismissal of his co-defendant where such right did not previously exist? Appellants claim *Hilen* did create such a right. They identify it as "the right of the appellants for an apportionment of fault."

While we agree that this right exists, it does not give a party the right to apportion fault to persons whose liability has been judicially determined not to exist. In this case, Dr. Farmer's and Baptist Hospital's right to apportion liability to Dr. Best and University Associates was extinguished when summary judgment was granted in their favor.

Our review of the case law shows that the ability generally to apportion damages *among joint tort-feasors* has nearly ancient origins. And the parameters of the right to apportionment among joint tort-feasors has not substantially changed over time.

It is true that *Hilen* authorized the apportionment of fault between a plaintiff and a defendant. *Stratton v. Parker*, 793 S.W.2d 817, 819 (Ky.1990). However, the apportionment of fault *among joint tort-feasors* can be traced back well into the nineteenth century. *Stratton* at 818, *citing Alexander v. Humber*, 86 Ky. 565, 6 S.W. 453, 453, 9 Ky.L.Rptr. 734 (1888)(Recognizing that the offense of one tort-feasor "is often more wanton and aggravating than that of another."). Fourteen years before *Hilen*, the Supreme Court articulated "a precise recognition of the authority of a jury to apportion the liability among joint tort-feasors, even in cases where one of the tort-feasors had settled the claim against him and had been dismissed as a party to the action." *Stratton* at 818–19, *citing Orr v. Coleman*, Ky., 455 S.W.2d 59 (1970). Therefore, we conclude that *Hilen* created no new right to apportionment of fault *among joint tort-feasors*.

If we doubted our conclusion—on the theory that *Hilen* elevated the apportionment of fault between joint tort-feasors from a jury's option to a full-fledged right of a tort defendant—we would have been rescued by the legislature's enactment of KRS 411.182. That statute allows allocation of fault among "each claimant, defendant, third-party defendant, and person who has been released from liability" pursuant to "[a] release, covenant not to sue, or similar agreement entered into by a claimant and a person liable[.]" KRS 411.182(1), (4). Excluded from this list are two categories of persons: (1) those who were never named as defendants or third-party defendants, and (2) those who were once defendants or third-party defendants

but were dismissed from the action because they were found not to be liable. Dr. Best and University Associates fall in this second category. Therefore, even if it could be argued that *Hilen* created this new right, KRS 411.182 took it away.

The Supreme Court has already confirmed this interpretation. In *Jefferson County Com. Attorney's Office v. Kaplan,* 65 S.W.3d 916 (Ky.2001), a former criminal defendant brought a legal malpractice action against his trial counsel, who then joined two prosecutors and a Kentucky State Police chemist as third-party defendants. The third-party defendants' motions to dismiss were granted because they were immune from suit. The defendant attorney argued that, under KRS 411.182, the third-party defendants should still be included in the apportionment. The Court of Appeals agreed because "to do otherwise would penalize [the attorney] for their ` immunity." *Id.* at 922.

But the Supreme Court reversed, stating that the "Court of Appeals approached this problem from the wrong direction [and its] conclusion is contrary to the plain language of the statute." *Id.* The Supreme Court noted that while the prosecutors and the chemist were once third-party defendants, they "are not third-party defendants as listed in KRS 411.182(1). Nor are they settling tort-feasors under section (4)."[5] *Id.*

This is sound logic since a party who remains in an action has yet to be found faultless, and the party who settles has determined his degree of fault by agreement. The degree of fault of the party who is dismissed from the action on liability grounds has also been determined, but as a matter of law; his apportionment of liability under the statute is 0%.

The claim that Dr. Best and University Associates are directly liable to Jenkins is her claim to assert. When that claim was denied, it was her right to appeal the decision. However, Dr. Farmer and Baptist Hospital are no more entitled to appeal the trial court's denial of Jenkins' claim than they would have been to file it in circuit court in the first place.

Because we find that Dr. Farmer and Baptist Hospital have no standing or right to appeal the trial court's denial of Jenkins' claims against Dr. Best and University Associates, their appeals shall be dismissed.

### STANDARD OF REVIEW

The standard of review on appeal when a trial court grants a motion for summary judgment is "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft,* 916 S.W.2d 779, 781 (Ky.App.1996); CR 56.03. "The trial court must view the evidence in the light most favorable to the nonmoving party, and summary judgment should be granted only if it appears impossible that the nonmoving party will be able to produce evidence at trial warranting a judgment in his favor." *Lewis v. B & R Corp.,* 56 S.W.3d 432, 436 (Ky.App.2001), *citing Steelvest v. Scansteel Serv. Ctr., Inc.,* 807

---

**5.** The narrowness of this interpretation of KRS 411.182 was criticized by Justice Keller (joined by Justices Graves and Stumbo) who stated, "I believe that, if the evidence at trial justifies an inference of liability on the part of [the dismissed third-party defendants], the trial court's jury instructions should require apportionment of fault against them. The majority's contrary holding narrowly interpreting the language of KRS 411.182 'violates the main purpose of comparative fault by improperly subjecting the defendants to liability in excess of their proportion of fault.'" *Jefferson County Com. Attorney's Office v. Kaplan,* 65 S.W.3d 916, 928 (Ky.2001)(Keller, J., dissenting).

S.W.2d 476, 480–82 (Ky.1991). "Impossible," as set forth in the standard for summary judgment, is meant to be "used in a practical sense, not in an absolute sense." *Lewis* at 436.

The trial court "must examine the evidence, not to decide any issue of fact, but to discover if a real issue exists." *Steelvest* at 480. "The moving party bears the initial burden of showing that no genuine issue of material fact exists, and then the burden shifts to the party opposing summary judgment to present 'at least some affirmative evidence showing that there is a genuine issue of material fact for trial.'" *Lewis* at 436, citing *Steelvest* at 482. Because summary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue *de novo*. *Scifres* at 781.

## NON–EXISTENCE OF THE PHYSICIAN–PATIENT RELATIONSHIP

██ A medical negligence case, like any negligence case, requires proof that: (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached the standard by which his or her duty is measured; and (3) consequent injury. "Duty, the first element, presents a question of law." *Pathways, Inc. v. Hammons,* 113 S.W.3d 85, 89 (Ky.2003). "If no duty is owed by the defendant to the plaintiff, there can be no breach thereof, and therefore no actionable negligence." *Ashcraft v. Peoples Liberty Bank & Trust Co., Inc.,* 724 S.W.2d 228, 229 (Ky.App.1986).

Because we are reviewing a summary judgment, we must identify from the record the material facts about which there are no genuine issues. If such facts are sufficient upon which to base a legal conclusion as to whether a duty exists, we must state that conclusion.

██ There is no genuine issue regarding the following facts. While Jenkins was in Baptist Hospital, Dr. Best was at another location and therefore never available to offer medical assistance. Dr. Best never saw or examined Jenkins, never spoke to her or consulted or gave her advice. Dr. Best never reviewed Jenkins' chart or made any entry in it. Dr. Best never consulted with Dr. Farmer while Jenkins was under his care. Dr. Best never issued either medical or nonmedical orders. Nor did she render any opinions or recommendations. She did not participate in Jenkins' diagnosis or treatment. The extent of her involvement was to inform Baptist Hospital nurses that she was unavailable to perform an ultrasound until the morning of March 29, 2003. In summary, Dr. Best did nothing that constitutes an undertaking to render medical care to Jenkins.

██ The physician's duty to a patient arises when, by his words *or deeds,* "he agrees to treat a patient, thus establishing a physician/patient relationship." *Noble v. Sartori,* 799 S.W.2d 8, 9 (Ky.1990). In the case before us, Dr. Best said nothing and did nothing that would establish the traditional physician-patient relationship or any other. Consequently, Dr. Best owed no duty to Jenkins.

Jenkins argues, however, that "in medical malpractice cases ... the duty element is not defined by the relationship of the parties." In support of this position, Jenkins relies primarily on two cases. The first is *Grayson Fraternal Order of Eagles v. Claywell,* 736 S.W.2d 328 (Ky.1987), which expresses the "universal duty of care" by which every person owes a duty to every other person to exercise ordinary care to prevent foreseeable injury. *Id.* at 332. The second is *Noble, supra,* which seems at first blush to impose a duty upon

a physician even in the absence of a traditional physician-patient relationship. Neither case compels our reversal of the summary judgments.

### GRAYSON AND THE "UNIVERSAL DUTY OF CARE"

"*Grayson* is cited often by parties advocating a theory of liability or a cause of action where none previously existed and legal authority is otherwise lacking." *James v. Wilson,* 95 S.W.3d 875, 891 (Ky. App.2002). In other words, parties turn to *Grayson's* sweeping statement of "universal duty" where the facts of their case do not support a duty based on recognized legal relationships.

■ We are convinced that our courts never intended their recent references to "universal duty" as establishing a principle whereby a plaintiff could satisfy the first element of a cause of action for negligence—duty—by mere citation to *Grayson.* *See Estate of Vosnick v. RRJC, Inc.,* 225 F.Supp.2d 737, 740 (E.D.Ky. 2002)("[T]his much is clear: *Grayson* is most emphatically *not* a jurisprudential panacea for litigants faced with an uphill challenge in establishing the existence of a legal duty of care." Emphasis in original.).

That is not to say that we dispute the existence of the concept. As recently as *Louisville Gas and Elec. Co. v. Roberson,* 212 S.W.3d 107 (2006), the Supreme Court cited *Grayson* as having recognized its existence. We note, however, that *Grayson's* articulation of the concept has been substantially abridged by subsequent decisions. *See, e.g., DeStock No. 14, Inc. v. Logsdon,* Ky., 993 S.W.2d 952 (1999)(overruled as superseded by statute); *James* at 891 ("Subsequent decisions illustrate that the duty has been narrowly applied, thereby undermining appellants' reliance on *Grayson.*"); *see also Johnson v. S.O.S.*

*Transport, Inc.,* 926 F.2d 516, 520 (6th Cir.1991)("[T]he continued viability of the universal duty concept under Kentucky law is questionable."). Significantly, our Supreme Court also recently said "the 'universal duty of care' is not boundless." *T & M Jewelry, Inc. v. Hicks ex rel. Hicks,* 189 S.W.3d 526, 531 (Ky.2006).

What then are we to make of the irony of a "universal duty" that is anything but universal? It does seem counterintuitive that we define this duty more by its limitations than by its comprehensive applications. The fact is that we can only understand this irony by examining the "universal duty" in the context of its origins.

We begin by noting that "[t]he treatment of the concept of negligence as expressing a universal duty is a hundred years old." *Tabler v. Wallace,* 704 S.W.2d 179, 186 (Ky.1985).

> The evolution of a separate tort theory of negligence, recognizing liability based on the *universal duty* of reasonable care owed by all to all, *separate from contractual duty,* took place in the common law during the latter part of the 19th century.

*Williams v. Fulmer,* 695 S.W.2d 411, 414 (Ky.1985)(emphasis supplied). We also note that in those earlier days the right to recover for personal injuries occasioned by the negligence of another was very narrowly drawn.

In 1893, Kentucky's highest court said "if one of two persons fighting unintentionally strikes a third, or if one uncocks his gun ... and it accidentally goes off, and hurts a looker-on, or if he drives a horse too spirited, or pulls the wrong rein, or uses a defective harness, and the horse, taking fright, injures another ... for these various instances of negligence the person injured has his remedy *by action of tres-*

pass." *Perkins v. Stein,* 94 Ky. 433, 22 S.W. 649, 650–51, 15 Ky.L.Rptr. 203 (1893)(emphasis supplied; citations and internal quotation marks omitted).

A few years later, in 1899, the same court acknowledged the limited nature of actions to remedy personal injury.

> If a druggist should sell a man poison for a harmless medicine, *the suit for damages therefor would not be an action for injury to the person,* although great suffering or loss of health had resulted from it.

*Menefee v. Alexander,* 107 Ky. 279, 53 S.W. 653, 654, 21 Ky.L.Rptr. 980 (1899)(emphasis supplied).

Even as late as 1922, actions for violation of "any legal duty" would lie only if "the facts ... constituted a wrong in law, *cognizable as trespass, trespass on the case, or breach of contract[.]* " *Smith v. Gowdy,* 196 Ky. 281, 244 S.W. 678, 679 (1922)(emphasis supplied). We take note of the absence of a distinct cause of action for negligence. This was consistent across the country and largely constant for the previous centuries.

> Negligence as a basis of civil liability was unknown to mediaeval law. For damage to the person, the sole remedy was trespass, and trespass did not lie in the absence of aggression, and that *direct and personal.*

*Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 345, 162 N.E. 99, 101 (N.Y.1928)(emphasis supplied) [6]; *see also Colonial Pipeline Co. v. Brown,* 258 Ga. 115, 365 S.E.2d 827, 831–32 (1988), *quoting* W.L. *Prosser and* W.P. *Keeton, Prosser & Keeton, Handbook on the Law of Torts,* pp. 2, 8–11 (5th ed., 1984)(setting forth a short history of the development of the law of torts.). Even Grayson itself recognized that tort liability was originally based in "the old English writ system, which only selectively recognized a duty and provided a remedy at the King's pleasure." *Grayson, supra,* at 330.

Intentionally or not, when the Supreme Court said that "[t]he requirement of 'duty to all' is a beginning point for any duty analysis[,]" *Grand Aerie Fraternal Order of Eagles v. Carneyhan,* 169 S.W.3d 840, 849 (Ky.2005), *quoting Fryman v. Harrison,* 896 S.W.2d 908, 909 (Ky.1995), it was referencing a historical genesis, and not merely an analytical starting point. The purpose in referring to a "universal duty," both in the early opinions and in recent ones, was never to define the duty element of actionable negligence. The phrase simply distinguished modern negligence theory from the much narrower archaic legal bases upon which personal injuries formerly were remedied—contract and trespass. By contrast with the scope of duty recognized in those former causes of action, the

---

**6.** In fact, in the historic and seminal negligence case of *Palsgraf* itself, the *literal* concept "of a 'universal duty of care' was rejected ... and the 'relational negligence' theory was adopted instead." *Middleton v. Village of Nichols,* 114 Misc.2d 596, 599, 452 N.Y.S.2d 157, 160 (N.Y.Sup.1982). Said Justice Cardozo, "Negligence, like risk, is thus a term of relation.... [N]egligence, not at large or in the abstract, but *in relation to the plaintiff,* would entail liability for any and all consequences, however novel or extraordinary." *Palsgraf,* 162 N.E. at 101 (emphasis supplied).

The literal "universal duty" theory is explained in the *Palsgraf* dissent of Justice Andrews as "a duty imposed on each one of us *to protect society from unnecessary danger,* not to protect A, B, or C alone." *Id.* at 102 (Andrews, J., dissenting). For those interested in the underlying philosophies of the competing theories represented in the majority and dissenting opinions of *Palsgraf,* see G.E. White, *Tort Law in America, An Intellectual History* 14–18, 97–101 (1980), portions of which were cited in *Grayson* at 330.

duty imposed by negligence theory *was virtually* "universal."

It is easy to understand why *Grayson* has seduced appellants into relying on the concept of a "universal duty." But despite its value as a "catch phrase," *James, supra,* at 891, the "universal duty of care," has no meaning in Kentucky jurisprudence beyond the most general expression of negligence theory, and certainly none absent a relational context as evidenced by the circumstances of each case. *Kirschner by Kirschner v. Louisville Gas & Elec. Co.,* 743 S.W.2d 840, 848 (Ky.1988)("The duty to exercise reasonable care commensurate with the circumstances not to injure other human beings is the universal duty owed by everyone to everyone."); *Sheehan v. United Services Auto. Ass'n,* 913 S.W.2d 4, 6 (Ky.App.1996)("[T]his is a point frequently overlooked by some, the duty to exercise ordinary care is commensurate with the circumstances."). Our courts have been known to articulate that relational context as "duty," and "its 'functionally equivalent' alternative characterizations[,]" "foreseeability" and "proximate cause." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 713, 115 S.Ct. 2407, 2420, 132 L.Ed.2d 597 (1995)("We have recently said that proximate causation 'normally eliminates the bizarre,' and have noted its 'functionally equivalent' alternative characterizations in terms of foreseeability and duty[.]" Citation omitted.). But no matter how it has been labeled, our courts have never found liability in tort unless we have first found circumstances giving rise to a relationship of some kind in which one particular party owed a duty to another particular party.

Because the "universal duty" espoused by Jenkins is simply an expression of the general theory of negligence law, neither it nor the cases that reference it constitute a basis upon which this Court could justify reversing the summary judgments in favor of Dr. Best and University Associates.

### NOBLE AND THE PHYSICIAN'S DUTY TO TREAT

Jenkins cites *Noble v. Sartori,* 799 S.W.2d 8 (Ky.1990), for the proposition that the law imposes an implied duty requiring physicians to treat patients even in the absence of a physician-patient relationship or any other relationship. We believe Jenkins misreads *Noble.*

Amel Noble, it turns out, was experiencing a heart attack. He and his brothers made their way to the local hospital emergency room. One brother approached Dr. Sartori, "who was dressed 'like a doctor,' i.e., in a white coat and bearing a stethoscope[, and asked him] more than once to 'help my brother, he's having a heart attack.'" Dr. Sartori admitted that Noble's brother could have been correct in his estimation of his brother's condition, but, because he was not on emergency room duty at the time, he merely instructed them twice to "sign in" or "get in line" for treatment. *Id.* at 8–9.

Dr. Sartori defended the medical negligence lawsuit filed by Noble's estate against him by claiming he owed Noble no duty in the absence of a physician-patient relationship. The doctor prevailed in the circuit court and at the Court of Appeals. But the Supreme Court granted discretionary review and reversed, holding "the law implies a duty wherever circumstances put *parties in a relationship to each other* where when one acts negligently it causes injury to the other." *Id.* at 9–10 (emphasis supplied). The court addressed the relationship this way:

> The premise underlying Dr. Sartori's position that he had no duty in this case, is that a physician's duty to act with reasonable care only arises after he agrees to treat a patient, thus establish-

ing a physician/patient relationship. While this is true as an abstract proposition, *the question is whether that abstract proposition applies in the specific circumstances of this case.* *Noble* at 9 (emphasis supplied). The *Noble* court therefore never said that there was no physician-patient relationship between Sartori and Noble. Acknowledging that "the abstract resolution of whether there is a duty is invariably result oriented[,]" the Supreme Court said, "Certainly, a physician who is consulted in an emergency has a duty to respect that interest, at least to the extent of making a good-faith attempt to provide adequate treatment or advice." *Id.* at 9, *quoting Rockhill v. Pollard,* 259 Or. 54, 485 P.2d 28, 32 (1971).

In short, we do not read *Noble* as doing away with the necessity of a legally cognizable relationship between the patient and the physician as a prerequisite to the finding that a duty existed. *See Andrew v. Begley,* 203 S.W.3d 165, 170 (Ky.App. 2006)("[T]he duties owed to [plaintiff] by these medical professionals stem from the relationship of a physician and patient."). *Noble* simply broadened, for that case and those factually indistinguishable from it, the circumstances under which that relationship can be created. We do not believe the Supreme Court intended *Noble* to be extended beyond its facts, and certainly not as far as would be necessary to establish a duty in the case before us.

Factually, *Noble* is clearly distinguishable from the case *sub judice.* In *Noble,* the physician was present in the emergency room when the patient arrived. In other words, unlike Dr. Best, he was "available at the hospital on the morning in question[.]" *Id.* at 9. Furthermore, unlike Dr. Best, the physician in *Noble* did undertake to give direction, albeit indirectly, to the patient. *Id.* Quoting from Judge Wil-

hoit's dissent in the Court of Appeals opinion *Noble* reversed, the Supreme Court said, "Here we have a physician in a hospital, obviously functioning as a physician on the staff does, who takes it upon himself on three occasions *to direct the decedent's brother what to do."* *Id.* (emphasis supplied).

In conclusion, *Noble* does not support the finding of a duty owed by Dr. Best to Jenkins.

### *JENKINS' ADDITIONAL AUTHORITY*

Jenkins also refers us to numerous cases from other jurisdictions encouraging us to dispense with the concept that the physician-patient relationship is necessary to the creation of a physician's duty of care. None of these cases is persuasive.

Most of these cases are easily distinguished because, unlike Dr. Best, the physician in each of them actually undertook the treatment of the patient. *Troxel v. A.I. Dupont Institute,* 450 Pa.Super. 71, 675 A.2d 314, 322 (Pa.Super.1996); *DiMarco v. Lynch Homes–Chester County, Inc.,* 384 Pa.Super. 463, 559 A.2d 530 (Pa.Super.1989); *Diggs v. Arizona Cardiologists, Ltd.,* 198 Ariz. 198, 8 P.3d 386, 387 (Ariz.App.2000); *Miller v. Rivard,* 180 A.D.2d 331, 585 N.Y.S.2d 523 (N.Y.A.D. 1992); *Hand v. Tavera,* 864 S.W.2d 678, 679 (Tex.App.-San Antonio 1993).

In *Millard v. Corrado,* 14 S.W.3d 42 (Mo.App.1999), the Missouri court held that a state regulation regarding the conduct of hospital emergency room physicians evidenced a public policy that justified expansion of the physician's duty on public policy grounds. *Millard* at 47. Kentucky's legislature, upon whose primary authority such a policy must be based, has not yet deemed a similar regulation appropriate for our Commonwealth. Consequently, no such public policy is at play here.

*Hiser v. Randolph,* 126 Ariz. 608, 617 P.2d 774 (Ariz.App.1980), held that by assenting to hospital bylaws regarding emergency room duties, the defendant-physician waived lack of a physician-patient relationship as a defense. *Hiser* at 777–78, disapproved, *Thompson v. Sun City Community Hosp., Inc.,* 141 Ariz. 597, 688 P.2d 605 (Ariz.1984). Here, there is no waiver issue.

Of the cases Jenkins cites, the closest by analogy is *Fought v. Solce,* 821 S.W.2d 218 (Tex.App.-Hous. [1 Dist.] 1991). But *Fought* is a much better case for Dr. Best than for Jenkins. In *Fought,* the trial court granted summary judgment in favor of the physician because no physician-patient relationship was created between the plaintiff, who had been an emergency room patient, and the physician who had been "on call," and who was called, but who declined to see the patient. *Id.* at 220 ("*[A] physician is not to be held liable for arbitrarily refusing to respond to a call of a person even urgently in need of medical or surgical assistance provided that the relation of physician and patient does not exist at the time the call is made or at the time the person presents himself for treatment.*" Citation omitted and internal quotation marks; emphasis in original).

Nothing in these additional cases persuades us that, in the absence of a physician-patient relationship, Dr. Best owed a duty to Jenkins.

### RESTATEMENT (SECOND) OF TORTS, § 324A

In *Ostendorf v. Clark Equipment Co.,* 122 S.W.3d 530 (Ky.2003), the Kentucky Supreme Court adopted Restatement (Second) of Torts § 324A, as a basis for imposing a duty. This section of the Restatement says:

> One who undertakes, gratuitously or for consideration, to render services to an-

other which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

> (a) his failure to exercise reasonable care increases the risk of such harm, or

> (b) he has undertaken to perform a duty owed by the other to the third person, or

> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

This legal concept has been labeled ominously as the "undertaker's doctrine." *Louisville Gas and Elec. Co. v. Roberson,* 212 S.W.3d 107, 109 (Ky.2006). As the name implies, there must be an "undertaking." This is the first time the doctrine has been considered in Kentucky in the context of a medical negligence claim.

Whether a party to be charged engaged in an "undertaking" depends on the facts. Again, if those facts are not in dispute, and they are sufficient for this Court to make a legal determination of this issue, we shall do so. We examine the facts affecting Dr. Best's duty and University Associates' duty separately.

### Dr. Best's Undertaking

■ In order to find that Dr. Best owed an independent duty to Jenkins under the "undertaker's doctrine," we must find that she personally engaged in some affirmative act amounting to a "render[ing of] services to another[,]" which in this case would be Jenkins or Dr. Farmer or Baptist Hospital. We have already found no genuine issue on this point; Dr. Best engaged in no such activity. This section of the Restatement, therefore, will not impose a

duty on Dr. Best in favor of Jenkins because she engaged in no undertaking.

### University Associates

The complaint states that University Associates "undertook to provide appropriate medical care and treatment to Marilyn Jenkins." That undertaking was memorialized in the contract with Baptist Hospital. It is undisputed that University Associates had performed these very services for Baptist Hospital and its patients in the past. On the night in question, University Associates did not provide the services Baptist Hospital contracted for, relied upon, and previously received. The case of *Louisville Gas and Elec. Co. v. Roberson*, 212 S.W.3d 107, 111 (Ky.2006) presents an analogous situation.

In *Louisville Gas*, Louisville Gas and Electric Company ("LG & E") entered into a contract with the Jefferson County Fiscal Court to maintain street lamps. One evening after dark, a ten-year-old pedestrian was struck by an automobile at an intersection with an inoperable street lamp. The pedestrian claimed the poorly lighted intersection contributed to the accident and brought a negligence action against LG & E. *Louisville Gas* at 108. The trial court entered summary judgment in favor of LG & E finding "no duty recognized under common law[.]" *Id.* at 109.

The Supreme Court reversed, finding the contract was the source of a duty in favor of the pedestrian which gave rise to liability under Section 324A of the Restatement. *Louisville Gas* at 111 ("It is quite elementary that a duty to exercise the proper degree of care may have its origin, as here, in a contract.").

The Court was initially concerned with the distinction between misfeasance and nonfeasance, stating, "the defendant is of course subject to liability if he assumes a duty by making a safety promise, and then negligently performs it, causing injury. That is a simple case of misfeasance and neither privity nor nonfeasance rules apply." *Id.* In *Louisville Gas*, it was not misfeasance that was claimed, but nonfeasance. Nevertheless, the Supreme Court found that nonfeasance could be the basis of liability under Section 324A.

> The cases are not always clear whether liability depends upon active negligence or whether nonfeasance would suffice, but liability is imposed and the very fact that courts do not actually notice the distinction is itself evidence that they are entirely willing to impose liability for *negligent nonperformance of a safety promise.*

*Id.* (emphasis supplied), *citing* Dan B. Dobbs, *The Law of Torts* § 321 (2001)(internal citations omitted). The Supreme Court found this consistent with Kentucky law. *Id.,citing Louisville Cooperage Co. v. Lawrence*, 313 Ky. 75, 230 S.W.2d 103, 105 (1950); *see also H.R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 166, 159 N.E. 896, 898 (1928)("The hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all."); *see also, Randolph's Adm'r v. Snyder*, 139 Ky. 159, 129 S.W. 562, 563 (1910)("If the defendant ... simply broke the contract by refusing to come when sent for or to undertake the case, the right of action would be simply for the breach of the contract, and there would be no right of action in tort.").

The determination of "duty presents questions of law and policy." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky.2003). The primary focus of the determination is foreseeability. *Id.,citing* David J. Leibson, Kentucky Practice, *Tort Law* § 10.3 (West Group 1995). We are convinced that the predicament of understaffing, resulting in Dr. Best's inability to

perform services for Jenkins, was entirely foreseeable by University Associates. To paraphrase Section 324A, "One who undertakes ... to render services to another [must] exercise reasonable care to protect his undertaking[.]"

We here point out the distinctions that find a duty owed by University Associates where none is found for Dr. Best. There are two.

First, University Associates made a promise to Baptist Hospital to provide perinatal services. This alone can be the basis of a duty under Section 324A. *Louisville Gas, supra,* at 111. The Commentary to the Restatement describes it this way.

> [T]here is no essential reason why the breach of a promise, relied upon by the promisee or by a third person, with resulting physical harm to the latter, should not result in liability in tort. [T]he question is left open in the absence of sufficient decisions.

Restatement (Second) of Torts § 324A *Comment f.* (1965). We believe this is a fair interpretation of the Supreme Court's rationale in *Louisville Gas* and, in view of that case, we believe the question is no longer left open in Kentucky.

Second, in addition to making the promise, University Associates actually undertook the performance of perinatal services for Baptist Hospital. Its previous successful performance of those services pursuant to the contract gave rise to Baptist Hospital's reliance upon University Associates' undertaking. Under Section 324A(c) of the Restatement, this is an independent basis upon which to establish a duty. While Dr. Best may have acted as University Associates' functionary for a portion of the time, there is nothing in the record that indicates Baptist Hospital placed its reliance on Dr. Best personally, but it did place such reliance on her employer, University Associates, with which it had a contract.

The summary judgment in favor of University Associates shall be reversed. Whether University Associates was negligent and whether its negligence, if any, was a substantial factor in causing the injuries complained of will be for the trier of fact to determine on remand.

### THIRD–PARTY BENEFICIARY

Jenkins also presents an argument based in contract, i.e., that she is a third-party beneficiary of the contract between University Associates and Baptist Hospital. The first hurdle that Jenkins faces is that her complaint does not allege a third-party beneficiary claim. *Traylor Bros., Inc. v. Pound,* 338 S.W.2d 687, 688 (Ky.1960)("[P]laintiff was not entitled to recover because there was no pleading of [a contract] *having been made for plaintiff's benefit,* or at all. Pleading was prerequisite to proving it." Emphasis supplied.). Additionally, in her prehearing statement, filed in accordance with CR 76.03, Jenkins identified the issue on appeal as follows:

> Did Appelles [sic] owe a duty to Marilyn Jenkins and her unborn child as a result of the physician/patient relationship?

CR 76.03(8) states:

> A party shall be limited on appeal to issues in the prehearing statement except that when good cause is shown the appellate court may permit additional issues to be submitted upon timely motion.

No motion has been filed to expand the issues beyond that stated in her prehearing statement. However, in view of *Capital Holding Corp. v. Bailey,* 873 S.W.2d 187, 197 (Ky.1994)(CR 76.03 is a rule of "substantial compliance with appropriate sanctions primarily dependent upon whether and what prejudice resulted to

the opposing party[.]"), and because we perceive no prejudice to appellees, we will consider the issue.

In view of *Daniel Boone Clinic, PSC v. Dahhan, M.D.,* 734 S.W.2d 488 (Ky.App.1987), we believe Jenkins' argument that she was a third-party beneficiary under the contract must fail. This Court in *Dahhan,* reviewed a contract between a physician and a hospital and said that

> [t]his is an employment contract involving professional services. Although the patients are the ones served, they are only incidental beneficiaries of this contract. *Long v. Reiss,* 290 Ky. 198, 160 S.W.2d 668 (1942); *King v. National Industries, Inc.,* 512 F.2d 29 (6th Cir. 1975).

*Dahhan* at 491.

As described in our summary of facts, *supra,* the contract in question was primarily for Baptist Hospital's benefit. The contract was designed to allow Baptist Hospital to represent itself, and be accredited, as a hospital capable of providing perinatal services to its patients. It was neither directly nor primarily for the benefit of the patients themselves. *Krahwinkel v. Commonwealth Aluminum Corp.,* 183 S.W.3d 154, 162 (Ky.2005)("Under Kentucky law, before a third person who is not a party to a contract can derive benefit from that contract, the third person must show that the contract was made and entered into directly or primarily for the benefit of the third person.").

Jenkins asks us to reverse *Dahhan* as misinterpreting the cases upon which it is based. We decline to do so. *Dahhan* has stood for this specific principle for two decades. Furthermore, this principle has been applied with the same effect, and in the context of the case now before us, by our sister states. *See, e.g., Anderson v. Houser,* 240 Ga.App. 613, 620–21, 523 S.E.2d 342, 348 (Ga.App.1999); *Oja v. Kin,* 229 Mich.App. 184, 192–92, 581 N.W.2d 739, 743–44 (Mich.App.1998).

We hold that Jenkins is not entitled to bring a claim as a third-party beneficiary of the contract between University Associates and Baptist Hospital.

## CONCLUSION

For the foregoing reasons, we DISMISS the appeals filed by Baptist Hospital and Dr. Farmer (2006–CA–001286 and 2006–CA–001295, respectively). The summary judgment in favor of Dr. Best is AFFIRMED and the summary judgment in favor of University Associates is REVERSED and REMANDED to the Jefferson Circuit Court for proceedings consistent with this Opinion.

ALL CONCUR.