NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0488n.06

No. 19-5031

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Aug 19, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| APPALACHIAN REGIONAL HEALTHCARE, INC., | ) ) ) ) | |
| Plaintiff-Appellee, | ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| U.S. NURSING CORP., | ) ) | |
| Defendant-Appellant. | ) ) | |

BEFORE:     ROGERS, KETHLEDGE, and LARSEN, Circuit Judges.

ROGERS, Circuit Judge.  Appalachian Regional Healthcare, Inc. (Appalachian) and U.S. Nursing Corp. (U.S. Nursing) were co-defendants in an earlier state court suit.  They both settled with the plaintiffs in that state court proceeding, and Appalachian now seeks indemnity from U.S. Nursing for its settlement payment based on the contract between these two entities.  As part of its contract with Appalachian, U.S. Nursing agreed to indemnify and defend Appalachian for the negligence of any U.S. Nursing employee that was assigned by U.S. Nursing to Appalachian.  After a jury trial on the indemnity claim, the jury found U.S. Nursing liable under the contract for the costs Appalachian incurred in defending and settling the state court lawsuit.  But U.S. Nursing complains on appeal that the district court made numerous errors during the proceeding below.  U.S. Nursing alleges that the district court improperly precluded it from defending itself on a critical issue in the case based on the collateral estoppel doctrine, allowed Appalachian to introduce undisclosed expert testimony, admitted settlement discussions as proof of the reasonableness of

Appalachian's settlement in the state court litigation, and admitted the amount of U.S. Nursing's own settlement in the state court litigation as proof of the reasonableness of Appalachian's settlement. U.S. Nursing's assertion that the district court erred in its collateral estoppel ruling is correct, but U.S. Nursing's other arguments are unpersuasive.

The state court litigation stemmed from a horrific injury that Ralph Profitt, a maintenance worker at a sawmill, sustained on October 2, 2007. Profitt was attempting to repair machinery at the sawmill when the machinery unexpectedly activated and collapsed on his back, causing a severe spinal injury. Profitt's co-workers rushed him to the hospital in a truck, where he was lifted by an unidentified female nurse into a wheelchair and pushed into the emergency room (ER) without any stabilization of his injured spine. In addition to suing the manufacturer and installer of the machinery, Profitt and his wife sued Appalachian, U.S. Nursing, and the three female nurses who were staffing the ER that night. Profitt alleged that his injuries were exacerbated when the nurse who moved him from the truck to the ER failed to stabilize and immobilize him. Two of the nurses that Profitt sued were employed by Appalachian, Sheila Hurt and Roxanne Parsons, and one of the nurses sued was employed by U.S. Nursing and supplied to Appalachian under a staffing agreement, Constance Foote. Profitt asserted that Appalachian was vicariously liable for Hurt, Parsons, and Foote's actions and that U.S. Nursing was vicariously liable for Foote's actions. The Profitts sought approximately $23.5 million in compensatory and punitive damages.

The state court granted summary judgment to Appalachian on all claims against it except for the claim of vicarious liability for the nurses' negligent actions. The state court also granted an unopposed motion for summary judgment in favor of Hurt and Parsons, and later prohibited any party from arguing or introducing evidence that Hurt or Parsons was the nurse who came out of the ER to assist Profitt. Further, the manufacturer and installer of the equipment settled with

the Profitts for about $3 million. This left Appalachian, U.S. Nursing, and Foote as remaining defendants. Appalachian remained as a defendant on the theory of vicarious liability for Foote's actions.

After eight years of litigation and on the eve of trial, Appalachian settled with the Profitts for $2 million on April 1, 2016. At this point, Appalachian had spent approximately $1 million in defense costs. U.S. Nursing also separately settled with the Profitts for $1.1 million later that same day.

Subsequently, Appalachian sought to enforce U.S. Nursing's indemnity obligations under the staffing agreement, but U.S. Nursing refused to reimburse Appalachian. This led Appalachian to file suit in federal district court alleging that U.S. Nursing breached its duty to defend and indemnify Appalachian. Appalachian asserted four claims against U.S. Nursing: (1) that U.S. Nursing breached its duty to defend Appalachian in the Profitt litigation; (2) that U.S. Nursing breached its duty to indemnify Appalachian for the costs it incurred in defending and settling the Profitt litigation; (3) that U.S. Nursing breached the implied covenant of good faith and fair dealing relating to its obligation to obtain insurance coverage for malpractice claims; and (4) common-law indemnity. Appalachian voluntarily dismissed its common-law indemnity claim and the district court dismissed Appalachian's claim for breach of the covenant of good faith and fair dealing. The two remaining claims for breach of the duties to indemnify and defend went to trial.

To succeed on the indemnity claim, the district court declared that Appalachian must prove: (1) that Nurse Foote performed a negligent or intentional act; (2) that Appalachian was subject to liability or suffered damage; (3) that Nurse Foote's act proximately caused Appalachian's damage; and (4) that Appalachian's settlement was reasonable. The case was tried in two phases. Phase 1 focused on the identity of the female nurse who transported Profitt into the ER and whether the

nurse's conduct was negligent. Phase 2 dealt with whether Appalachian's $2 million settlement was reasonable.

Prior to trial, Appalachian moved *in limine* to preclude U.S. Nursing from arguing that either Hurt or Parsons was the nurse who transported Profitt to the ER; the motion was based on the state court's grant of summary judgment dismissing the claims against Hurt and Parsons. The district court granted Appalachian's motion and prohibited U.S. Nursing from introducing any evidence or arguing to the jury that either Hurt or Parsons was the nurse who transported Profitt into the ER. The district court determined that U.S. Nursing was precluded from making such arguments because the issue had been litigated in the state court proceeding and the state court had granted summary judgment in favor of Hurt and Parsons. The district court reasoned that U.S. Nursing "had a full and fair opportunity in state court to respond to the nurses' motion for summary judgment and to present evidence indicating that either nurse moved Profitt," and rejected U.S. Nursing's argument that it did not have an incentive to litigate the issue.

Subsequently, U.S. Nursing asked the court to reconsider this decision. U.S. Nursing argued for the first time that it was prohibited from objecting to Hurt and Parsons' summary judgment motion because it was a co-defendant. However, the court could not find any legal support for this assertion that a defendant cannot oppose a summary judgment motion filed by another co-defendant. U.S. Nursing also presented another new argument: that it did not have an opportunity to fully litigate the issue of whether Hurt or Parsons moved Profitt because U.S. Nursing as a co-defendant could not appeal the summary judgment ruling dismissing Hurt and Parsons. But the district court rejected this argument, too. The court stressed that U.S. Nursing chose not to litigate the issue when it had the opportunity to do so, which prohibited it from raising

the matter on appeal, regardless of whether a defendant can appeal the dismissal of a co-defendant. Accordingly, the district court denied U.S. Nursing's motion to reconsider.

During phase 1 of the trial, the jury heard evidence regarding the identity of the nurse who transported Profitt into the ER. Profitt and one of the men who accompanied Profitt to the hospital, David English, testified that they believed Foote was the nurse in question. Although Foote denied that she was the nurse who transported Profitt into the ER and stated she might have been with another patient when Profitt was at the hospital, Appalachian's Chief Nursing Officer, Ellen Wright, explained that the medical records from that night indicated that Foote's treatment of other patients would not have precluded her from transporting and attending to Profitt. U.S. Nursing objected at various points to Wright's testimony, alleging that her testimony ventured into the realm of expert testimony, but the district court largely overruled these objections. The court reasoned that Wright was testifying as to what the medical records showed and opining on the level of care that the other patients likely required based on her knowledge of the practices and procedures of the hospital based on her position as Chief Nursing Officer. The district court explicitly warned that Wright could not offer opinions more generally on the proper standard of care. At the end of phase 1, the jury found that Foote was the nurse who transported Profitt into the ER and that Foote acted negligently in doing so.

During phase 2 of the trial, the jury heard evidence regarding Appalachian's settlement. As part of Appalachian's evidence that its settlement was reasonable, Appalachian presented statements made during a January 21, 2016 meeting in which Appalachian and U.S. Nursing's lawyers and representatives discussed settlement estimates and potential exposure prior to settling with the Profitts. Although U.S. Nursing moved *in limine* to preclude statements from this meeting from being admitted at trial, the district court denied this motion as premature at least in part

because the court was not entirely clear on what statements were at issue. The court also determined that the January 21, 2016 meeting was not a settlement meeting because the Profitts were not present, and therefore Federal Rule of Evidence 408 prohibiting the admission of statements made during settlement negotiations about a claim "to prove or disprove" the validity or amount of the claim or for impeachment purposes did not apply. Even if the January 21, 2016 meeting did constitute a settlement negotiation, the court nonetheless determined that Rule 408 did not prohibit Appalachian from using the statements to prove the reasonableness of its settlement in the case below. U.S Nursing did not object at trial to the admission of these statements.

Further, the court admitted U.S. Nursing's $1.1 million settlement with the Profitts. Appalachian used this evidence as part of its argument that its $2 million settlement was reasonable, as U.S. Nursing's $1.1 million settlement was in addition to the amount Appalachian settled for. At the conclusion of phase 2, the jury found that Appalachian's settlement and defense costs were reasonable. Ultimately, the court entered judgment in favor of Appalachian in the amount of $2,823,522.71, plus prejudgment interests and costs.

U.S. Nursing now appeals several of the district court's decisions. First, U.S. Nursing challenges the district court's order giving preclusive effect to the state court's ruling that neither Hurt nor Parsons transported Profitt into the ER. Second, U.S. Nursing alleges that the district court erred in admitting Wright's testimony. Third, U.S. Nursing contends that the district court erred in admitting evidence from the January 21, 2016 meeting in which Appalachian and U.S. Nursing's lawyers and representatives discussed settlement estimates and potential exposure prior to settling with the Profitts. Fourth, U.S. Nursing claims that the district court erred in admitting the amount of its settlement with the Profitts. U.S. Nursing's first contention that the district court

incorrectly applied the collateral estoppel doctrine is correct, but U.S. Nursing's other arguments are without merit.

I.

The district court erred in giving preclusive effect to the state court's summary judgment ruling that neither Hurt nor Parsons was the nurse who transported Profitt into the ER. Reviewing that determination de novo, *see Stemler v. Florence*, 350 F.3d 578, 585 (6th Cir. 2003), we conclude that U.S. Nursing did not have a full and fair opportunity to litigate this issue at the state court level.

We must give the state court's judgment the same preclusive effect as that decision would be given under the law of the state in which the judgment was rendered. *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). We must therefore look to Kentucky law on collateral estoppel to determine whether the district court was correct in precluding U.S. Nursing from arguing that Hurt or Parsons was the nurse in question. *Anderson v. City of Blue Ash*, 798 F.3d 338, 350 (6th Cir. 2015) (quotations, brackets, and citation omitted). Under Kentucky law, a party is precluded from arguing about an issue if: (1) the party to be bound was a party in the first case; (2) the issue in the second case is the same as the issue in the first case, (3) the issue was actually litigated, (4) the issue was actually decided, and (5) the decision on the issue in the prior action was necessary to the court's judgment and adverse to the party to be bound. *Miller v. Admin. Office of Courts*, 361 S.W.3d 867, 872 (Ky. 2011); *Yeoman v. Kentucky*, 983 S.W.2d 459, 465 (Ky. 1998). The rule contemplates an inquiry into "whether the judgment in the former action was in fact rendered under such conditions that the party against whom [issue preclusion] is pleaded had a realistically full and fair opportunity to present his case." *Moore v. Kentucky*, 954 S.W.2d 317, 319 (Ky. 1997) (citing *Sedley v. City of West Buechel*, 461 S.W.2d 556, 559 (Ky. 1970)).

Kentucky law also inquires whether preclusion serves the "principles of justice and fairness." *Berrier v. Bizer*, 57 S.W.3d 271, 281 (Ky. 2001). We understand U.S. Nursing's argument essentially to be based on whether it had a "realistically full and fair opportunity to present [its] case" and whether preclusion serves the "principles of justice and fairness," given that the summary judgment was not legally "adverse" to it.

U.S. Nursing did not have a full and fair opportunity to litigate the issue at the state court level. In short, U.S. Nursing had no legally protected interest in opposing the state court's grant of summary judgment for Hurt and Parsons. This lack of "standing" is reflected in Kentucky cases that over the years have consistently held that a defendant may not appeal a co-defendant's dismissal. These cases have so held both before and after Kentucky adopted comparative negligence. Also, although the cases largely deal with multiple defendants who could each have jointly caused the injury, they apply *a fortiori* to cases like this one where the harm could have been caused by only one of the alleged tortfeasor-defendants. The defendant's lack of a legal interest to oppose dismissal of a claim against a co-defendant logically means there was no full and fair opportunity to litigate the co-defendant's liability for collateral estoppel purposes in the former litigation, and collateral estoppel accordingly does not apply. Several Kentucky high court decisions support this conclusion.

Kentucky courts have long held that "[i]t is a universal rule that a joint tort-feasor against whom judgment has been rendered will not be heard to complain on appeal, especially in the absence of cross-appeal, that judgment was not obtained against a codefendant to the suit or that the suit was dismissed as to a codefendant." *Martin v. Ackman*, 110 S.W.2d 437, 438–39 (Ky. 1937) (citations omitted). As the Kentucky Court of Appeals explained in *Jenkins v. Best*, 250 S.W.3d 680, 685–87 (Ky. Ct. App. 2007), this rule survived both the adoption of comparative

negligence and the ensuing adoption of the Kentucky apportionment statute. The rationale for these decisions is not some appeal-specific doctrine, such as a requirement of finality, but rather that the defendant seeking to appeal had no legal interest in keeping the co-defendant in the suit in the first place. Thus, the court in *Jenkins* reasoned:

> The claim that Dr. Best and University Associates [dismissed co-defendants] are directly liable to Jenkins [plaintiff] is her [plaintiff's] claim to assert. When that claim was denied, it was her right to appeal the decision. However, Dr. Farmer and Baptist Hospital [remaining defendants] are *no more entitled to appeal the trial court's denial of Jenkins' claim than they would have been to file it in circuit court in the first place.*
> Because we find that Dr. Farmer and Baptist Hospital have *no standing or right to appeal* the trial court's denial of Jenkins' claims against Dr. Best and University Associates, their appeals shall be dismissed.

*Id.* at 687 (emphasis added). *See also Dwyer Concrete Lifting of Lexington, Inc. v. Alchemy Eng'g, Inc.*, No. 2009-CA-001970, 2013 WL 375471, at *2 (Ky. Ct. App. Feb. 1, 2013). Accordingly, a defendant does not have a legal interest in stopping its co-defendant's dismissal just to keep the co-defendant in the damages pool.

It is true that cases like *Martin*, *Jenkins*, and *Dwyer* involved defendants who were potentially jointly liable, unlike the present case where only one of the three nurses could have been a tortfeasor. But that distinction cuts against Appalachian rather than in its favor. In cases like *Martin*, *Jenkins*, and *Dwyer*, the appellants made the losing argument that because they sought to share their potential liability with co-defendants through common-law indemnity or apportionment, they had a sufficient interest in keeping them in the lawsuit. Neither U.S. Nursing nor Foote, in contrast, had any possible right, common-law or otherwise, to recover from the remaining defendants. All they wanted was to point the finger at the other nurses. In that situation, the holdings of cases like *Martin*, *Jenkins*, and *Dwyer* that a defendant has no standing to keep a co-defendant in the lawsuit apply even more strongly, not less.

If one defendant could not challenge the dismissal of a co-defendant in a negligence case, it follows that for collateral estoppel purposes the defendant did not have a full and fair opportunity to argue that co-defendant's negligence.

This conclusion finds support in Kentucky high court decisions, albeit from the time before non-mutual collateral estoppel was adopted in Kentucky, involving the same procedural scenario. The Court of Appeals of Kentucky (then the Kentucky high court), reasoned as follows:

> The general law on the question at bar is summarized in the Restatement of the Law of Judgments, Section 82, page 386, with an Illustration on page 387:
>
> '* * * where a person is injured by the concurrent negligence of two tortfeasors who are joined in one action, the fact that each of them attempts to show that the other was solely responsible for the accident or that the other alone was negligent does not make the issue of negligence res judicata in subsequent proceedings between them, where the liability of one to the other does not depend upon his liability to the injured person * * *.
>
> 'Illustration: 1. A and B are driving automobiles, which collide. C, a passenger in B's car, sues A and B. Whether the judgment is in favor of or against C as to either or both A and B, the issues as to negligence or other element of the cause of action are not res judicata in a subsequent action by A against B for damage to his car.'
>
> The rules of res judicata are based upon an adversary system of procedure designed for the purpose of giving persons an opportunity to litigate claims against each other. As a consequence, persons who have not had an opportunity of litigating between themselves the correctness of a determination which is the basis of a judgment for or against them are not concluded by such a determination in a subsequent action between them. Unless they were adversaries in the action in which the judgment was entered, the judgment merely adjudicates the rights of the plaintiff against each defendant, leaving unadjudicated the rights of the defendants between themselves.
>
> In our present Civil Code of Practice there is no provision for cross-claims in tort actions by one defendant against another, and as a consequence no judgment could be given one defendant against the other in the action by Johnson's administratrix against Rucker and Clark's administratrix. In a colloquial sense, each defendant had acted adversely to the other in pleading the death of Johnson was caused solely by the negligence of the other, but their action did not constitute them adverse parties, 'those who, by the pleadings, are arrayed on opposite sides.' Under our present procedure, Rucker and Clark's administratrix could not be on 'opposite sides' from each other in the action brought against them by Johnson's administratrix . . . It is not enough that they, by their separate answers, deny liability and claim that the accident was due to the negligence of the other, as such pleading only goes to answering the claim of the plaintiff, and tenders no issue to which the

>      other defendant may demur or reply to or join issue upon so as to settle the liability
>      one to the other.'

*Clark's Adm'x v. Rucker*, 258 S.W.2d 9, 9–11 (Ky. 1953) (citations omitted).  This case has been

cited with approval in the context of claim preclusion by the modern Supreme Court of Kentucky,

speaking unanimously:

>      This Court long ago held "that a judgment against codefendants is not conclusive
>      as between themselves with respect to their rights and liabilities toward each other
>      unless an issue was made between them or the parties in the second action were
>      adversary parties in the first action."  *Brown Hotel Co. v. Pittsburgh Fuel Co.,* Ky.,
>      311 Ky. 396, 224 S.W.2d 165, 168 (1949); *see also Clark's Adm'x v. Rucker,* Ky.,
>      258 S.W.2d 9 (1953).  Appellant and the Elliotts were co-defendants in the original
>      action brought by Cox; and the causes of action underlying this appeal have never
>      been adjudicated.  Accordingly, Appellant is not barred from his claims against the
>      Elliotts for breach of contract, indemnification, and unjust enrichment, pursuant to
>      the doctrine of res judicata.

*Buis v. Elliott*, 142 S.W.3d 137, 141 (Ky. 2004).

To be sure, the old issue-preclusion cases are different in that they preceded the adoption

of non-mutual collateral estoppel by the Kentucky high court in 1970.  *See Sedley*, 461 S.W.2d at

559.  In other words, before 1970, issue preclusion could not be invoked by a non-party to the

earlier case. (Also, while *Buis* came later, in 2004, it involved claim preclusion, which continues

to be unavailable to a non-party to the previous case.  *See Buis*, 142 S.W.3d at 139–41; *see also*

*Miller*, 361 S.W.3d at 871–73.)  The relevance of the *Clark's Adm'x* holding, then, depends upon

whether its adversariness requirement was superseded by the elimination of the mutuality

requirement (i.e., by eliminating the requirement that the party asserting issue-preclusion have

been a party in the prior case), or whether the adversariness requirement survived as a requirement

with respect to the party in the earlier case who actually did lose on the issue.  If the adversariness

requirement survived, it did so as part of the element of non-mutual issue preclusion that the

estopped party have had a "full and fair opportunity to litigate" the issue.  If the "full and fair

opportunity to litigate" is to serve as a fair substitute for the requirement that the party claiming issue preclusion have been a party to the previous case, it is hard to see why the adversariness required to subject a prior party to mutual estoppel should not apply at a minimum to subject a party who lost the issue in question in an earlier case to non-mutual estoppel.

More recently, the Supreme Court of Kentucky has stated as much. In order for issue preclusion to operate as a bar to further litigation, "'the decision on the issue in the prior action must have been necessary to the court's judgment' and *adverse to the party to be bound*." *Miller*, 361 S.W.3d at 872 (emphasis added). The *Miller* opinion relied in turn upon *Moore*, which "gathered from *Sedley*" the following essential elements of collateral estoppel: "(1) identity of issues; (2) a final decision or judgment on the merits, (3) *a necessary issue with the estopped party given a full and fair opportunity to litigate*; [and] (4) *a prior losing litigant*." *Moore*, 954 S.W.2d at 319 (citing *Sedley*, 461 S.W.3d at 559) (emphasis added). In the present case, the state court's summary judgment was not "adverse to" U.S. Nursing, and U.S. Nursing was not a "prior losing litigant."

Our conclusion that collateral estoppel does not apply is further buoyed by the Restatement of Judgment's recognition that lack of availability of appellate review is an exception to collateral estoppel. Restatement (Second) of Judgments § 28(1) (Am. Law Inst. 1982). Kentucky courts have turned to the Restatement when analyzing collateral estoppel. *See, e.g.*, *Yeoman*, 983 S.W.2d at 465; *Bd. of Educ. of Covington v. Gray*, 806 S.W.2d 400, 403 (Ky. Ct. App. 1991).

It is true that the state trial court ruled, presumably on the basis of law of the case, that U.S. Nursing could not point the finger at Hurt and Parsons, in light of the court's earlier unopposed grant of summary judgment in their favor. As a matter of determining what decisions to follow to determine the law of Kentucky, however, we of course follow the decisions of the Kentucky

Supreme Court and the Kentucky Court of Appeals when in conflict with an unpublished evidentiary ruling of a state trial court made one week before the case settled out. The district court in this case, moreover, explicitly declined to rely on the state court's evidentiary ruling as a matter of collateral estoppel.

Accordingly, the district court erred in determining that collateral estoppel applied because U.S. Nursing did not have a full and fair opportunity to litigate the issue as an adverse litigant. Because phase 1 of the trial below focused in large part on the identity of the female nurse who transported Profitt into the ER, and the district court is of course familiar with the evidence presented in that proceeding, we remand for the district court to determine in the first instance whether or not the error in granting the *in limine* motion requires a new trial.

We recognize that our collateral estoppel analysis is not presented in precisely the same terms as those used by U.S. Nursing, which has focused narrowly on whether it could have appealed the summary judgment grant. These differences, however, do not amount to a failure to raise the determinative question regarding collateral estoppel in this case: whether U.S. Nursing was precluded by collateral estoppel from pointing the finger at Hurt and Parsons because it lacked a full and fair opportunity to litigate their status as the actual tortfeasor. U.S. Nursing did make the argument that it lacked appellate standing to challenge the state court's grant of summary judgment for Hurt and Parsons and therefore it could not be deemed to have had a full and fair opportunity to litigate the issue in state court. At a status conference hearing on the collateral estoppel issue on May 25, 2018, U.S. Nursing repeatedly stressed that Kentucky law prohibited it from appealing the grant of summary judgment in favor of Hurt and Parsons as part of its argument that the district court should reconsider its exclusion of any argument that Hurt or Parsons was the

nurse in question. Also, U.S. Nursing put forth this argument in its one-page filing in support of its motion to reconsider. Accordingly, U.S. Nursing did not waive this argument.

II.

The district court did not abuse its discretion in admitting Wright's testimony as lay opinion testimony. Testimony based on particularized knowledge gained through personal experience, especially by virtue of one's position in a business, as was the case with Wright, is treated as lay opinion. *United States v. Kerley*, 784 F.3d 327, 336–37 (6th Cir. 2015). Wright's testimony was based on her review of the applicable medical records and knowledge and experience as Appalachian's Chief Nursing Officer. Her testimony did not run afoul of Rule 701(c)'s prohibition on lay witnesses giving opinion testimony based on scientific, technical, or other specialized knowledge within the scope of expert testimony. *See* Fed. R. Evid. 701(c).

U.S. Nursing objected multiple times during Appalachian's direct examination of Wright. First, U.S. Nursing objected to Appalachian's question about whether there was anything about the condition of the other patients in the ER, besides Profitt, that would require the nurses to be occupied in the event an emergency occurred. The district court held a bench conference to fully assess U.S. Nursing's reason for objecting. The court clearly articulated that Wright could not offer any opinion on the proper standard of care, which would veer into expert witness territory, but could give testimony on the hospital's practices and procedures based on her knowledge and experience as Appalachian's Chief Nursing Officer and could testify about what the medical records show. After this objection was overruled, Wright responded that "[b]ased on the review of the charts and documentation that is in the charts, there was very minimal nursing interventions documented in either of the other charts." Appalachian followed by asking whether the chart that Wright had made of the times the nurses entered when they administered procedures to the other

patients besides Profitt reflected whether the nurses were treating the other patients at the time Profitt was in the ER. Wright responded that "there [wa]s no documentation in either of the other two patients' charts during the time frame that Mr. Profitt was in the emergency room." Also, Wright opined that this would indicate that there were not nurses in the other patients' rooms while Profitt was in the ER. This testimony was based on Wright's review of the nurses' documentations in the medical records. Such testimony was also based on her particularized knowledge of the hospital's policies for treating patients depending on their condition, which was gained by virtue of her position as Appalachian's lead nursing official. This testimony was not "specialized knowledge" within the purview of Rule 702, as Wright did not opine generally about nursing standards of care. *See Kerley*, 784 F.3d at 336–37.

Next, U.S. Nursing objected when Appalachian asked about a patient's chart that Foote initialed prior to Profitt's arrival at the ER and then initialed again after Profitt had left the ER. Foote initialed the other patient's chart at 2010, 2015, 2020, 2025, 2230, and 2240. Appalachian asked Wright about the gap in time documented on the other patient's chart between 2025 and 2230, during which time Profitt was in the ER. Specifically, Appalachian inquired whether "based on the normal practices at [Wright's] hospital, Connie Foote would likely have been in the room with Mr. Profitt?" Wright responded "[y]es" after the court overruled U.S. Nursing's objection on the matter. Wright then answered affirmatively when Appalachian asked whether the time entries showing when the nurses were treating other patients indicated that Foote would not have been preoccupied with another patient and would have been able to go outside to meet Profitt and take him into the ER. As the district court explained during its bench conference regarding this objection, Wright's testimony here was based on her study of the medical records that the hospital has maintained and her familiarity with the nursing practices and procedures of the hospital. This

was not improper expert testimony. To the extent that U.S. Nursing believed Wright's testimony could be called into question because she was not present that night to know whether Foote was in the room with Profitt or attending to another patient, the district court explicitly informed U.S. Nursing that would be proper to raise on cross-examination, which U.S. Nursing did.

Finally, U.S. Nursing objected to Appalachian's question regarding whether there would have been any reason that a nurse would have needed to be in the room with one of the other patients rather than attending to Profitt based on the normal practice at the hospital and Profitt's condition. The court overruled this objection. Wright responded:

> Based on looking at both of the other patients' charts and the lab work and the x-rays and their vital signs and the nursing assessments of both of those patients, there is no indication that any nurse would have been in that room doing any specific procedure that required any amount of time, given that you had a critical patient that needed immediate interventions, and it took more than one nurse to render them.

Again, this testimony was based on Wright's knowledge and experience from her role as Appalachian's Chief Nursing Officer and her review of the applicable medical records. *See Kerley*, 784 F.3d at 336–38. Her testimony focused on her review of the patients' records, which indicated they were in non-emergent condition, and her comparison of those patients' records to Profitt's emergent condition. She further founded her testimony in Appalachian's policies and procedures for when a trauma patient is admitted to the ER. This was lay testimony and did not run afoul of Rule 701(c).

Thus, the district court did not abuse its discretion in admitting this testimony from Wright. This was lay opinion testimony and did not venture into expert testimony.

III.

U.S. Nursing's argument that the district court should not have permitted evidence from the parties' January 21, 2016 meeting regarding the potential settlement of the Profitts' claim is

also unpersuasive.  U.S. Nursing failed to preserve its objection to these discussions and these statements were admitted for a purpose other than to "prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction."  Fed. R. Evid. 408.

U.S. Nursing did not preserve its evidentiary objection to the admission of discussions from the January 21, 2016 meeting.  U.S. Nursing moved *in limine* prior to trial to have these statements excluded, but the district court denied this motion.  The district court denied this motion as "premature."  The district court explained:

> FRE 408 prohibits the admission of statements made during settlement negotiations about a claim "to prove or disprove" that claim or for impeachment purposes.  The January 21, 2016 meeting was not a settlement meeting.  The Profitts were not even present.  Further, to the extent the meeting was a settlement negotiation, it dealt with the Profitts' claims in the state-court action.  Rule 408 does not prohibit Appalachian from using the statements in this action to prove its claims here.  It is unclear precisely what statements are at issue.  Thus, the Court is unable to weigh the probative value and potential prejudice of the statements.  As discussed above, however, any statements regarding whether Nautilus would cover a verdict against Appalachian that Appalachian was aware of at the time it settled are more probative than prejudicial as to the reasonableness of the settlement.

This ruling's explicit declaration that U.S. Nursing's motion was being denied as "premature" indicates that the ruling was qualified and left open the opportunity for U.S. Nursing to object to the introduction of these statements at trial.  In determining the proper standard of review for a district court's evidentiary ruling on a motion *in limine*, we have recognized that "if the trial court has made an explicit and definitive ruling on the record of the evidentiary issues to be decided, and has not indicated that the ruling is conditioned upon any other circumstances or evidence, then counsel need not renew the objection at the time the evidence is offered . . . in order to preserve the error for appeal . . . However, if the court's ruling is in any way qualified or conditional, the burden is on counsel to raise objection to preserve error."  *United States v. Poulsen*, 655 F.3d 492,

510 (6th Cir. 2011) (quoting *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999)). U.S. Nursing never renewed its objection at trial. Accordingly, we apply plain error review given the tentative nature of the district court's ruling and U.S. Nursing's failure to object at trial to preserve error.

U.S. Nursing's assertion that the district court directly ruled on Rule 408's application and only potentially deferred its ruling on admissibility based on other grounds, such as relevancy, reads the district court's opinion too narrowly. The district court's statement that it was denying U.S. Nursing's motion as "premature" was not circumscribed to only some aspects of the motion. The ruling never said that only some of U.S Nursing's arguments in support of its objection could be appropriately raised later. Instead, the court's clear declaration that the motion was denied as "premature" demonstrated that all of U.S. Nursing's objections to the admission of the statements from the January 21, 2016 meeting could be appropriate later. Thus, U.S Nursing needed to object at trial to preserve error, which it did not do.

Assuming, without deciding, that the January 21, 2016 meeting statements regarding the potential value of the Profitts' claim, the parties' potential exposure, and the strategy to try to settle the dispute occurred during settlement discussions, the district court did not commit plain error in admitting them because these statements were not admitted for a prohibited purpose. Rule 408 precludes "conduct or a statement made during compromise negotiations about the claim" to "prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408. These statements were not admitted for the precluded purpose of proving the validity or amount of the disputed claim. Appalachian and U.S. Nursing are not arguing in this litigation about the validity or amount of the Profitts' claim, which was the disputed claim at issue during the settlement discussions. Instead, Appalachian used these

statements to support the reasonableness of its settlement with the Profitts. The reasonableness of the settlement, which is necessary for Appalachian to succeed on its indemnity claim, is distinct from the validity and amount of the Profitts' claim. Parties take numerous factors into consideration beyond the validity of a claim or amount of that claim in determining whether to settle and how much to settle for. Parties may even reasonably decide to settle a claim that they do not believe is valid based on the risks associated with proceeding to trial. The statements regarding the assessment of the potential value of the Profitts' claim and the co-defendants' potential exposure was relevant to the reasonableness of Appalachian's settlement. Accordingly, the district court did not commit plain error in admitting these statements, as Rule 408 explicitly permits courts to admit such statements for purposes other than to address the validity or amount of a claim. Fed. R. Evid. 408(b).

IV.

Finally, the district court did not abuse its discretion in permitting Appalachian to introduce into evidence the amount of U.S. Nursing's settlement with the Profitts. Courts frequently consider the settlements that have occurred in similar cases as a relevant factor in evaluating a settlement's reasonableness. Also, the admission of U.S. Nursing's settlement did not violate Rule 408.

The district court did not err in determining that U.S. Nursing's settlement was admissible because U.S. Nursing faced a similar claim as Appalachian. U.S. Nursing and Appalachian both faced negligence claims in the Profitts' state court suit based on a nurse's negligent transportation of Profitt into the ER. The parties therefore faced extraordinarily similar claims arising out of the same underlying conduct. Courts commonly consider settlement amounts in similar cases. *See, e.g.*, *Visteon Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. CIV. 07-12250, 2008 WL 2026131, at *2 (E.D. Mich. May 12, 2008); *PPG Indus., Inc. v. Cent. Indus. Maint., Inc.*, No.

05CV1193, 2006 WL 2087529, at *3 n.2 (W.D. Pa. July 25, 2006); *Vetter v. Subotnik*, 844 F. Supp. 1352, 1355 (D. Minn. 1992). Although the parties may have faced some different risks in considering whether to settle or go to trial, such consideration is frequently different across cases— even in cases that bear striking similarities to one another. Thus, this factor does not demonstrate that the district court abused its discretion in admitting the amount of U.S. Nursing's settlement as a settlement amount in a similar matter.

U.S. Nursing's argument that its settlement was irrelevant to the reasonableness of Appalachian's settlement because U.S. Nursing's settlement occurred after Appalachian's settlement is also unavailing. Evidence of U.S. Nursing's settlement was admitted as evidence of a settlement that occurred in a similar matter. Therefore, the timing of when U.S. Nursing's settlement occurred compared to when Appalachian's settlement occurred did not render the settlement amount inadmissible.

Also, U.S. Nursing's contention that the admission of its settlement violated Rule 408 is unpersuasive. For the reasons explained in Part III, this settlement amount was not admitted to prove the validity or amount of the Profitts' claim, it was admitted to show the reasonableness of Appalachian's settlement.

V.

For the reasons stated above, we reverse the district court's collateral estoppel decision but affirm the district court's other decisions. We remand to the district court for further proceedings in accordance with this opinion.